1
2
3
4
5
6
7
8           UNITED STATES  DISTRICT COURT
9             Northern District of California
10                San Francisco Division
11   IRIS M. VALENCIA,                    No. C 11-06223 LB

12                 Plaintiff,             **ORDER GRANTING PLAINTIFF'S**
                                          **MOTION FOR SUMMARY**
13         v.                             **JUDGMENT, DENYING**
                                          **DEFENDANT'S CROSS-MOTION**
14                                        **FOR SUMMARY JUDGMENT, AND**
     MICHAEL J. ASTRUE,                   **REMANDING FOR FURTHER**
15                                        **CONSIDERATION**
                 Defendant.
16   _____/   **[Re: ECF Nos. 13, 19]**

17                           **INTRODUCTION**

18        Plaintiff Iris Valencia moves for summary judgment, seeking judicial review of a final decision

19   by defendant Michael Astrue, the Commissioner of Social Security Administration (the

20   "Commissioner"), denying her Social Security Income ("SSI") disability benefits for her claimed

21   disability of depression, fibromyalgia, chronic pain, asthma, heart burn, and regional pain syndrome

22   type 2.  Pl.'s Mot., ECF No. 13;[1] Administrative Record ("AR") 154.  The Administrative Law

23   Judge determined that Ms. Valencia could not perform her past relevant work but that she was

24   capable of performing another job, a "surveillance monitor" (DOT # 379.367-010), that existed in

25   significant numbers in the national economy.

26
27   _____

28        [1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
     generated page numbers at the top of the document.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

2    without oral argument.  All parties have consented to the court's jurisdiction.  ECF Nos. 5, 7.  For

3    the reasons stated below, the court **GRANTS** Ms. Valencia's motion for summary judgment,

4    **DENIES** the Commissioner's cross-motion for summary judgment, and **REMANDS** this case for

5    further reconsideration.

6                                          **STATEMENT**

7    **I.  PROCEDURAL HISTORY**

8        Ms. Valencia, now 52 years old, filed a Title II application for a period of disability and

9    disability benefits on April 13, 2007.  AR 146-49.  The Commissioner denied her application both

10   initially and upon reconsideration.  AR 92-95, 99-103.  On February 28, 2008, Ms. Valencia timely

11   requested a hearing before an ALJ.  AR 105.  An ALJ conducted a hearing on August 13, 2009 in

12   Oakland, California.  AR  48-87.  Ms. Valencia appeared with her attorney, Mr. Jeffrey Randolph,

13   and testified at the hearing along with vocational expert Jeff L. Clark (the "VE") and medical expert

14   Charles Agler.  AR 48.

15       The ALJ issued a decision on January 29, 2010 and found that Ms. Valencia was not disabled

16   because she was capable of performing another job, a "surveillance monitor" (DOT # 379.367-010),

17   that existed in significant numbers in the national economy.  AR 20-32.

18       Ms. Valencia timely requested that the Appeals Council review the ALJ's decision.  AR 16.  The

19   Appeals Council denied the request for review on September 1, 2011.  AR 8-10.  About a month

20   later, the Appeals Council again denied Ms. Valencia's request for review after looking at medical

21   records dated April 2010 to July 2010 from Kaiser Permanente.  AR 1-6.  That denial rendered the

22   ALJ's January 29, 2010 decision the Commissioner's final decision.  AR 1.

23       Ms. Valencia filed a complaint for judicial review under 42 U.S.C. § 405(g).  Compl., ECF No.

24   1.  Ms. Valencia and the Commissioner both now move for summary judgment.  Pl.'s Mot., ECF

25   No. 13; Comm'r's Opp'n and Cross-mot., ECF No. 19.

26   **II.  SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS**

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

This section summarizes (A) the medical evidence in the administrative record, (B) the medical expert's testimony (C) the vocational expert's testimony, (D) Ms. Valencia's testimony, and (E) the ALJ's findings.

**A. Medical Evidence**[2]

Ms. Valencia suffered from work-related injuries and was consequently diagnosed with a torn right rotator cuff, right carpal tunnel syndrome, right cubital tunnel syndrome, and de Quervain's tenosynovitis. AR 1046. To address these issues, Ms. Valencia underwent several surgeries. AR 1043. In addition to these work-related injuries, Ms. Valencia suffered from the following medical conditions: asthma, obesity, depressive disorder, chronic pain, and fibromyalgia. AR 1017, 1020, 1039. She has been admitted to the hospital on several occasions for asthma; nonetheless, a medical report dated June 2008 from Dr. Gourova, a Kaiser Permanente physician, indicated that Ms. Valencia's asthma is under control. AR 1067, 1093, 1063. In terms of treatment, Ms. Valencia was prescribed various medications for her conditions.[3] She was prescribed morphine for her condition of fibromyalgia. AR 1151, 1039. The record indicates that she has received psychiatric treatment from Dr. Harry Noda in 2004 and 2005. AR 229-30. In addition to psychiatric treatment, Ms. Valencia has an extensive medical record with Kaiser Permanente that dates from 2001 to 2009. AR 307-450, 648-1199. She also attended the Health Education for Living with Pain (HELP) program. AR 231.[4]

*1.* ***Dr. Janaleigh Hoffman***

---

[2] The record contains medical opinions from many doctors. For relevancy sake, the undersigned has limited the summaries to important medical evidence that the parties raised or the ALJ referred to in his opinion.

[3] According to Ms. Valencia's "Disability Report-Appeal - Form SSA-3441," she was prescribed estradiol (hormone replacement), flexeril (muscle relaxant), morphine (pain), nasarel (allergies), prilosec (acid reflux), prozac (depression), signular (asthma), and verapanil (hbp). AR 182. The record also contains other medications that she was prescribed.

[4] The ALJ explains that the HELP program is a "psychological treatment designed to assist in the development of non-medical pain management skills."

1   Ms. Valencia was referred to Dr. Hoffman to address the pains that she complained of in both of

2   her hands.  AR 1043.  On February 2008, Dr. Hoffman reviewed x-rays of Ms. Valencia's right

3   hand.  AR 1043.  The x-rays revealed that Ms. Valencia's bones were normal with good alignment

4   and "no signs of old or new trauma or degenerative change or erosions."  AR 1043.  Dr. Hoffman

5   also reported that Ms. Valencia stated that she was enrolled in the "Chronic Pain clinic."  AR 1043.

6          2.      **Dr. Kristina Artist on 03/29/06**

7   During a psychiatric examination follow-up with Dr. Kristina Artist, Ms. Valencia complained

8   of "depressed mood, anhedonia, crying spells, agitation, decreased energy and decreased

9   concentration."  AR 318.  In addition to referring Ms. Valencia to a depression group and pain

10  management program, Dr. Artist provided that Ms. Valencia's mental status was normal except for

11  depressed mood and tearfulness.  AR 318.

12         3.      **Dr. El-Sokkary on 7/30/07**

13  In July 2007, Ahmed El-Sokkary, a clinical psychologist, conducted a single, time-limited

14  examination of Ms. Valencia.  AR 304-06.  Dr. El-Sokkary administered the Wechsler Adult

15  Intelligence Scale-Third Edition (WAIS-III) on Ms. Valencia, and she obtained the following scores:

16  Full Scale IQ of 87, Verbal Scale of 83, Performance IQ of 94, Perception Organization Index of 94,

17  and a Verbal Comprehension Index of 89.  AR 305.  In addition, Dr. El-Sokkary noted that Ms.

18  Valencia's Bender Gestalt-II results "suggested below visual motor integration abilities that within

19  the extremely low range."  AR 306.  As for the Rey 15 test, Ms. Valencia reproduced 9 items.  AR

20  306.  Dr. El-Sokkary reported that the results of the Rey 15 test were within normal limits and

21  "analysis suggests that she did not put forth a fair effort."  AR 306.  Dr. El-Sokkary reported that

22  Ms. Valencia was alert and oriented, and she "was able to maintain a sufficient level of

23  concentration, persistence, and pace to do moderately complex work in an environment that health

24  condition would allow."  AR 305-06.  Furthermore, Dr. El-Sokkary diagnosed Ms. Valencia with

25  Depressive Disorder NOS.  AR 306.

26         4.      **Dr. Danilo Lucila on 08/28/2007**

27  Dr. Lucila prepared a psychiatric review technique on Ms. Valencia.  AR 451.  He reported that

28  Ms. Valencia had an affective disorder of sleep disturbance and a "Disorder DEP DO NOS."  AR

UNITED STATES DISTRICT COURT
For the Northern District of California

453-54.  As for functional limitations, Dr. Lucila reported that Ms. Valencia had a mild limitation in maintaining social functioning, performing daily activities, and maintaining concentration, persistence, or pace.  AR 459.  Overall, Dr. Lucila reported that Ms. Valencia's impairments were not severe.  AR 451.

### B.  Medical Expert

Dr. Charles Agler is the medical expert who testified at the hearing.  AR 70.  The ALJ asked Dr. Agler about an inconsistency on the Rey Test.  AR 71-72.  The ALJ questioned, "He (meaning, Dr. El-Sokkary) says RAIS [Rey] test was 9 correct out of 15, which he says is normal limit and analysis suggests that she did not put forth a fair effort.  That seems internally inconsistent to me.  Is there something I'm missing?"  AR 71.  Dr. Agler explained that Dr. El-Sokkary's report likely contained a typographical error, because 9 out of 15 is not within normal limits; normal limits should be closer to 15.  AR 72.  He further explained that this indicates that "it's possible that she [Ms. Valencia] could have functioned at a higher level."  AR 72.

Citing Ms. Valencia's records from the HELP pain management program, Dr. El-Sokkary's report, and Ms. Valencia's testimony at the hearing, Dr. Agler testified that Ms. Valencia has a mild limitation in concentration, persistence, and pace.  AR 73-74.  Dr. Agler explained that at the hearing, Ms. Valencia was able to pay attention to the issues, follow them, and provide appropriate responses.  AR 75.  Furthermore, Dr. Agler reasoned that Ms. Valencia did not appear to have a severe problem when Dr. El-Sokkary carefully measured her concentration.  AR 75.  On the other hand, Dr. Agler explained that "if you take the psychological at face value then yes, she might have some problem."  AR 75.

### C.  Vocational Expert

Jeff Clerk, the VE, identified Ms. Valencia's past relevant work as 1) a machine operator I (DOT#616.380-018) at SVP 3 and medium exertion; and 2) home attendant (DOT #354.377-014) at SVP 3 and medium exertion.  AR 76.  The ALJ then posed a hypothetical with the following limitations:

> If we have a hypothetical younger individual with a high school education, and the same past relevant work as the claimant who's limited to light level lifting with occasional stooping, kneeling, crouching, crawling, and reaching with the dominant upper extremity.  And occasional lever work with the dominant upper extremity.

> Occasional stair climbing, and no exposure to unprotected heights.  No concentrated exposure to dusts and fumes, and light limitations in ADLS, social functioning, concentration, persistence, and pace.  And a moderate limitation in understanding and supplementing detailed instructions.

AR 76-77.  Under the ALJ's hypothetical, the VE stated that Ms. Valencia would not be able to perform her past relevant work.  AR 77.  Alternatively, the VE found that such an individual could perform the work of a surveillance-system monitor (DOT#379.367-010), a sedentary, SVP 2, and unskilled position.  AR 77.  When the ALJ asked the VE if he could identify other positions that such an individual under the hypothetical could perform, the VE stated that he was "having difficulty identifying more jobs" due to the limitations listed.  AR 78-79.

   The VE testified that there are 114 positions regionally and 14,082 positions nationally for surveillance-system monitors.  AR 78.  Nevertheless, the VE found that surveillance-system monitor jobs are "greatly underreported" because the occupation, as described in the DOT, does not include the private industry of surveillance-system monitor.  AR 81.  The VE explained:

> In the greater San Francisco Bay area there are 114 of those jobs, however, I believe as do many vocational experts that that number is under reported, I think there's one employer that has more than that, so that is a greatly under reported number in my opinion.  In the national economy there are 14,082 of those jobs.  Again, I believe that's an under reported number.

AR 78.  In addition, the VE testified that the "essential functions of the job" as described in the DOT for government positions of surveillance-system monitors are the same as positions in the private sector.  AR 83.  The VE explained that the only difference is the classification of private versus public.  AR 82.

   In explaining that the number of surveillance-system monitor jobs are "greatly underreported," the VE expounded that most surveillance-system monitor jobs are not government positions.  AR 80.  He testified that "Walmart is the best example of that perhaps. . . . I've personally witnessed those jobs, and have done job analyses on them, so I'm familiar with that kind of work."  AR 80.  The ALJ then inquired as to the number of surveillance-system monitors that Wal-Mart employed.  AR 81.  In response the VE explained that he did not know the exact number:

> You know I don't have a number on that, Judge, but it's, it's high.  Many of the newer Walmarts, as you might know, are these larger stores, and so they have a

number of surveillance system monitors per store, per shift.  So there's a number of people doing this.  This also excludes, you know, other stores, other large stores that do this, it also excludes casinos, they're growing in number, and they all have surveillance monitors.  So the numbers are substantially higher than what is reported.

AR 81.  The ALJ then asked the VE about number of people that might be in one shift at a large Wal-Mart.  AR 81.  In response, the VE stated that he "would have to guess" because he had only completed job analyses and witnessed these jobs in a non-super store Wal-Mart.  AR 81.  The ALJ changed the question to a Wal-Mart that the VE specifically had witnessed and asked about how many shifts the VE witnessed.  AR 81.  In one particular non-super store Wal-Mart, the VE testified that there were likely six people employed and two to three shifts.  AR 81.

**D.   Ms. Valencia's Testimony**

At the hearing, Ms. Valencia described her medical conditions, past work experience, daily activities, and the side effects she experiences due to her medication.  AR 52-69.

First, the ALJ questioned Ms. Valencia regarding her obesity.  AR 52.  Ms. Valencia acknowledged that she has been gaining weight for the last few years, weighing about 260 pounds.  AR 52.  In explaining the reason for her weight gain, Ms. Valencia testified that the pain medication made her sleepy, somewhat depressed, and as a consequence, forced her to stay at home.  AR 52.

The ALJ then asked Ms. Valencia about her living situation and whether she drives.  She testified that she lives in Fremont with her three children and husband.  AR 52-53.  In addition, she does not drive and did not renew her driver's license, because it is difficult for her "to pay attention" to where she is going and concentrate on the roads.  AR 53.  Therefore, Ms. Valencia normally depends on her husband and takes the cab, if necessary, to reach a destination.  AR 53.

The ALJ also questioned Ms. Valencia regarding her past work.  From January 2001 to December 2004 Ms. Valencia served as a home attendant for her mother who had dementia.  AR 155.  In this capacity, Ms. Valencia cared for her mother "[a]round the clock pretty much."  AR 53.  She was responsible for preparing meals, doing chores, and feeding her mother.  AR 53.  In addition, Ms. Valencia also testified that she lifted her mom at times.  AR 56.

Even though Ms. Valencia had cared for her mother as a home attendant, Ms. Valencia testified that she would not be able to serve in this capacity for someone else.  AR 56.  She stated:

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1         I've had my - the chronic pain was bothering me back then as well, and I didn't
2    have any way of, of driving myself to and from wherever I had to go.  I basically did
     that type of job, because I had to watch my mom.  It wasn't something that I decided
3    to, let's say, that's the type of job I wanted to do.  My mom - I had to care for my
     mom.

4    AR 55.  In caring for her mother, Ms. Valencia experienced concussions from falls.  AR 56.  She

5    explained that as her mother's dementia worsened it became more difficult to care for her and that

6    "it was time to let her go where someone, you know, she could be taken care of."  AR 56.

7        Prior to caring for her mother as a home attendant, Ms. Valencia served as a machine operator

8    for Schlage Lock Company.  AR 57.  This position required Ms. Valencia to perform "different parts

9    to form a lock, and were different presses from just grabbing a piece of material, putting it on a die,

10   and then pressing buttons."  AR 57.  Moreover, Ms. Valencia testified that it "was heavier work

11   where I had to cut the raw material with either an electric saw or these huge scissors about this big,

12   and some parts were able to be cut."  AR 57.  In performing her job as a machine operator, she lifted

13   heavy pieces that weighed approximately 30 to 40 pounds.  AR 57.  She terminated this position

14   after being injured on the job a few times with surgeries in 1998 and 2000.  AR 58.

15       The ALJ then inquired about Ms. Valencia's medication and treatment.  Ms. Valencia testified

16   that she takes prescribed morphine three times per day.  AR 59.  She also testified that her doctor

17   recommended that she go to the pain clinic again.  AR 60.  Due to lack of transportation, Ms.

18   Valencia testified that she did not go to the pain clinic.  AR 61.  It takes about 10-15 minutes to

19   drive to the pain clinic but her husband has to attend work.  AR 61.  Furthermore, she testified that

20   there are no nearby buses and she "would have to walk quite a bit to catch a bus."  AR 61.

21       As to daily activities, Ms. Valencia testified that she typically takes a walk outside for ten

22   minutes.  AR 61.  In addition, she exercises, doing yoga, meditation, or stretching.  AR 61.  Ms.

23   Valencia testified that it takes her a while to cook but she does "light cooking" such as pasta and

24   casseroles.  AR 62.  In addition to "light cooking," she tries to clean as much as she can, but

25   "[a]void[s] things that[ are] going to flare-up anymore pain."  AR 61.  Ms. Valencia testified that she

26   does not vacuum or sweep and her husband or nephew would purchase groceries.  AR 62.  In

27   addition to the type of chores that Ms. Valencia completed, the ALJ also asked Ms. Valencia if she

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

had difficulty concentrating or focusing when completing her chores.  AR 63.  Ms. Valencia

affirmed that she has a very difficult time focusing when doing her chores.  AR 63.

**E.  ALJ's Findings**

Applying the sequential evaluative process, on January 29, 2010, the ALJ held that Ms. Valencia

was not disabled under § 216(i) and 223(d) of the Social Security Act and therefore was not entitled

to disability insurance benefits.  AR 23-32.

At step one, the ALJ found that Ms. Valencia had not engaged in substantial gainful activity

since the alleged onset date of December 15, 2004 through her last insured date of December 31,

2008.  AR 25.

At step two, the ALJ found that Ms. Valencia suffered from the following severe impairments:

status post right carpal tunnel release, status post right ulnar nerve transposition, status post right

rotator cuff repair, status post right de Quervain's release, asthma, obesity, and depressive disorder

not otherwise specified (NOS).  AR 25.

At step three, the ALJ found that Ms. Valencia did not suffer from an impairment or combination

of impairments that either was listed in the regulations or was medically equivalent to one of the

listed impairments.  AR 26-27.

The ALJ then determined Ms. Valencia's residual functional capacity ("RFC") in order to

assess at steps four and five whether she could perform her past relevant work or any other work

considering her age, education, and work experience.  The ALJ found that Ms. Valencia had the

following RFC:

> light work as defined in 20 CFR 404.1567(b), including lifting up to 20 pounds
> occasionally and 10 pounds frequently, and standing and/or walking for a total of
> about 6 hours in an 8-hour workday, with the following restrictions: no more than
> occasional climbing, stooping, kneeling, crouching, or crawling; no more than
> occasional reaching with the dominant (right) upper extremity; no more than
> occasional lever work with the dominant (right) upper extremity; no more than
> frequent (i.e., not constant) handling and/or fingering with the dominant (right) hand;
> no exposure to unprotected heights; no concentrated exposure to respiratory irritants
> (e.g., fumes, dusts, poor ventilation, etc.); slight limitation in activities of daily living,
> social functioning, and concentration, persistence or pace; and moderate limitation in
> understanding and implementing detailed instructions.

AR 27.  In making this RFC finding, the ALJ considered the symptoms and how consistent they

were with the objective medical evidence (based on the requirements of 20 C.F.R. § 404.1529 and

UNITED STATES DISTRICT COURT
For the Northern District of California

Social Security Rulings 96-4p and 96-7p).  AR 27.  He also considered opinion evidence under 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p.  AR 27.  Although he did not explicitly state it, the ALJ followed a two-step process, first determining whether there was a medically-determinable physical or mental impairment that reasonably could be expected to produce Ms. Valencia's pain and symptoms, and then evaluating the intensity, persistence, and limiting effects of the symptoms to determine the extent that they limited Ms. Valencia's ability to do basic work activities.  AR 27-28.  For the second part, whenever Ms. Valencia's statements about the intensity or functionally limiting effects of pain or other symptoms were not substantiated by objective medical evidence, the ALJ made findings on the credibility of the statements based on the evidence as a whole.  AR 27.

The ALJ noted that Ms. Valencia alleged that she suffered from constant pain throughout her entire body, particularly on her right side.  AR 27.  At the hearing she testified that "she continues to have radiating pain and numbness in her right upper extremity."  AR 27.  In addition, the ALJ observed that Ms. Valencia testified that she has difficulty standing and/ or walking without a cane. AR 27.  At most, she can only stand for 10-15 minutes and walk for about 10 minutes without a cane, sit only 5-10 minutes, and lift at most a gallon of milk (approximately 8 pounds).  AR 27.

In addition to Ms. Valencia's constant pain, the ALJ also noted that Ms. Valencia claimed that she suffered from asthma attacks three times per month, depending on weather, infection, cold or sinusitis.  AR 27.  As for the asthma attacks, the ALJ observed that Ms. Valencia testified at the hearing that her asthma was under control.  AR 27.

The ALJ then recounted Ms. Valencia's daughter's report to the State Agency.  AR 27.  Ms. Valencia's daughter described her mother's difficulty with dressing and feeding herself due to pains in the right arm and hand.  AR 27.  Furthermore, even though Ms. Valencia enjoys dancing, her daughter noted that she is unable to do so for long periods of time.  AR 27.  The ALJ observed that Ms. Valencia's daughter noted that Ms. Valencia has "difficulty performing postural activities because [of] 'back strain and stiffness.'" AR 27.  Despite these problems, the ALJ found that Ms. Valencia's daughter reported that her mother "is able to drive a car, go shopping in stores for food, clothes, and personal necessities, and handle her own finances."  AR 27.

After recounting Ms. Valencia's testimony and her daughter's statement to the State Agency, the ALJ found that Ms. Valencia's "medically determinable impairments could reasonably be expected to cause some alleged symptoms" but found that her and her daughter's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity (RFC) assessment."  AR 28.

The ALJ found that "the alleged need for a cane and other exertional limitations are without support from the medical records, which are conspicuously absent medical abnormalities that would account for significant problems with standing and/or walking."  AR 28.  On the contrary, the ALJ observed that the evidence indicates that Ms. Valencia did not have significant difficulties with walking and/or standing.  AR 28.  The ALJ pointed to Dr. Ribaudo's March 2006 examination, finding that Ms. Valencia had "normal gait and station, intact heel, toe and tandem walking, and normal and symmetric muscle tone in all extremities."  AR 28.  Furthermore, the ALJ reasoned that Dr. Desai's physical examination of Ms. Valencia revealed that a "normal gait and full (5/5) motor strength in the muscles of all extremities."  AR 28.  Therefore, the ALJ found that the evidence does not compel a finding of an individual that cannot perform the demands of light work.  AR 28.

As for Ms. Valencia's alleged inability to sit for more than 5-10 minutes, the ALJ noted that "she betrayed no evidence of pain or discomfort while remaining seated for more than 30 minutes during the hearing."  AR 28.  The ALJ opined that this observation is not conclusive of Ms. Valencia's overall level of pain on a daily basis.  As such, the ALJ provided Ms. Valencia the benefit of the doubt and gave "some weight" to her allegations, as reflected in the RFC.  AR 28.

As for Ms. Valencia's upper extremities, the ALJ provided that Ms. Valencia is restricted in the use of her upper extremities and provided an RFC reflecting these restrictions.  AR 28.  The ALJ pointed to Dr. Hoffman's report, indicating no significant abnormalities on the physical examination.  AR 28.  Despite clinical evidence and diagnoses indicating otherwise, the ALJ stated that he gave Ms. Valencia "the benefit of great doubt" and found an RFC reflecting a limitation in the use of the upper right extremity:

> Dr. Hoffman specifically "noted normal" appearing hands, with no sign of swelling or warmth, an ability to fully extend the fingers of both hands as well as touch the combined palmar crease with all fingers, and negative Finkelstein's test in both wrists.  An updated x-ray indicated that the bones of the right hand appeared

UNITED STATES DISTRICT COURT
For the Northern District of California

1   normal, with "good alignment, no sign of old or new trauma, and no sign of
2   degenerative change or erosions." Dr. Hoffman ordered a nerve conduction study,
    which was performed in May 2008 and was interpreted as "normal" with "no
3   electrophysiological evidence of [carpal tunnel syndrome]" and "no evidence of
    another upper extremity neuropathy." Notwithstanding the relative paucity of related
4   diagnostic and clinical findings in the record, giving the claimant the benefit of great
    doubt, I find in light of her medical/surgical history that she has been limited in the
5   use of her right upper extremity, and these limitations are reflected in the lifting
    restriction and non-exertional restrictions identified above.

6   AR 28.

7       As for the alleged asthma attacks, even though the record indicates that the asthma attacks were

8   generally under control, the ALJ provided environmental limitations in the RFC accounting for Ms.

9   Valencia's asthma attacks. AR 29. The ALJ noted that Ms. Valencia testified that her asthma was

10  under control. AR 28. In addition to Ms. Valencia's testimony, the ALJ explained that the medical

11  evidence also supports the finding that Ms. Valencia's asthma is under control. AR 28. The ALJ

12  noted that there were two incidences concerning Ms. Valencia's exacerbated asthma in December

13  2005 and 2007 that required physician intervention. AR 28. On the other hand, there is also

14  evidence that she failed to take her asthma medications. AR 29. Nevertheless, the ALJ found that

15  "the evidence as a whole supports the environmental limitations" specified in the RFC. AR 29.

16      The ALJ then explained that Ms. Valencia's alleged impairments did not preclude her from

17  working previously, thereby strongly suggesting her impairments would not preclude her from doing

18  so now "within the most restrictive limitations set forth." AR 29. The ALJ observed that Ms.

19  Valencia performed physically demanding work as a home attendant. AR 29. In addition, the ALJ

20  found that Ms. Valencia's participation in the HELP program in mid-2005 has increased her level of

21  overall functioning. AR 29. The ALJ reasoned that "those records describe the claimant's program

22  participation as a 'life-changing' experience, resulting in a 'significant increase in [her[] functioning,

23  social interactions, sense of well-being confidence and specific career goals.'" AR 29 (citations

24  omitted).

25      Turning to mental impairments, the ALJ found that Ms. Valencia continued to receive treatment

26  for pain and depression but "only briefly saw a mental health professional." AR 29. The ALJ

27  focused on psychologist Artist's report in early 2006, revealing that Ms. Valencia depressive

28  symptoms were the result of degenerative nerve disease and family stressors; however, psychologist

Artist reported in March 2006 that Ms. Valencia's mental status was normal, except for depressed mood and tearfulness.  AR 29.  Furthermore, the ALJ observed that Ms. Valencia's symptoms were noted by pscyhologist Artist as moderate in severity.  AR 29.  Similar to psychologist Artist's findings, Mr. Frank at the pain clinic intake interview reported that Ms. Valencia was stressed due to family conflicts but her mental status was normal.  AR 29.

The ALJ then described Dr. El-Sokkary's psychological examination.  The ALJ noted that "there were some clinical abnormalities" because Ms. Valencia reproduced only 9 items on the 15 Rey test.  AR 29.  This, the ALJ opined, indicated that Ms. Valencia may not have "put forth a fair effort."  AR 29.  Since this examination, the ALJ observed that Ms. Valencia has reported depressive symptoms but "has not generally received the type of mental health treatment that would bolster any allegation of an inability to perform mental tasks consistent with the range of work activity identified. . . "  AR 29.

In determining the RFC, the ALJ also looked at whether Ms. Valencia failed to seek treatment.  The ALJ noted that Ms. Valencia did not follow up with a psychiatrist even though Dr. Hoffman recommended that she do so.  AR 29.  In addition, she did not go to receive treatment for pain at a nearby pain clinic even though her primary physician recommended her to do so.  AR 29.  Even though Ms. Valencia's failure to follow the treatments that her physicians recommended is not conclusive as to her credibility or RFC, the ALJ noted that it does suggest "in light of the other evidence that her symptoms are not as serious as alleged."  AR 29-30.

Turning to daily activities, the ALJ found that Ms. Valencia's daily activities conflicts with her alleged symptoms and limitations.  AR 30.  The ALJ noted that Ms. Valencia testified to going for walks, exercising yoga, stretching, washing dishes, doing laundry, ironing clothes, cooking, and caring for her cats.  AR 30.  In addition, the ALJ observed "treatment records from Kaiser Permanente show that, for much of the period at issue, she was either caring for her mother or visiting her in a board and care facility, and 'helping to raise [her] newborn granddaughter.'"  AR 30 (citations omitted).  Consequently, the ALJ found that Ms. Valencia's daily activities do not compel a finding of a greater RFC.  AR 30.

1     In determining the RFC, the ALJ provided "considerable weight" to Drs. Compernole and Agler.

2     AR 30.  Dr. Compernole, a nonexamining physician, opined that Ms. Valencia "retained the physical

3     capacity to meet the demands of light work" with the restrictions that the ALJ set forth.  AR 30.  The

4     ALJ reasoned that he gave considerable weight to Dr. Compernole even though Dr. Compernole is a

5     nonexamining physician, because "it represents the most restrictive medical opinion regarding

6     physical capacity of record, and there exist a number of other reasons to reach similar conclusion (as

7     explained throughout this decision)."  AR 30.  In addition, the ALJ also provided Dr. Agler's

8     opinion that Ms. Valencia "retained the medical capacity to perform at least simple work, with only

9     a moderate limitation in understanding and implementing detailed instructions" considerable weight,

10    because Dr. Agler "had an opportunity to review and consider the entire record, including the

11    claimant's testimony."  AR 30.  Furthermore, the ALJ expounded that Dr. Agler's opinion "was

12    consistent with the medical record and there is no other medical opinion of record indicating that the

13    claimant has a great degree of mental limitation."  AR 30.

14        Having determined Ms. Valencia's RFC, the ALJ proceeded with steps four and five of the

15    sequential evaluative process.

16        At step four, the ALJ found that Ms. Valencia was not capable of performing her past relevant

17    work.  AR 30-31.  The ALJ summarized the VE's testimony regarding Ms. Valencia's relevant work

18    experience and stated that "[t]he VE testified that the demands of the claimant's PRW (meaning,

19    Ms. Valencia's past relevant work) exceed[ed] her RFC."  AR 31.  Therefore, based on the VE's

20    testimony, the ALJ concluded that Ms. Valencia was not capable of performing her past relevant

21    work as a machine operator I or a home attendant.  AR 30-31.

22        At step five, the ALJ noted that Mr. Ms. Valencia was a "younger individual" pursuant to 20

23    C.F.R. § 404.1563 and, transferability of skills was not a material issue because Ms. Valencia is

24    limited to unskilled work.  AR 31.  The ALJ then stated that the vocational expert was asked to

25    consider whether jobs existed in the national economy for an individual with Ms. Valencia's age,

26    education, work experience, and RFC.  AR 31.  The ALJ accepted the vocational expert's testimony

27    that Ms. Valencia could work as a surveillance-system monitor (DOT# 379.367-010).  AR 31-32.  In

28    addition, the ALJ expounded that "the VE added that the number of surveillance monitor positions is

UNITED STATES DISTRICT COURT
For the Northern District of California

'greatly underreported' because the occupation as described in the DOT is performed in a government setting, but the vast majority of such jobs are actually performed in the private sector." AR 31.  Moreover, the ALJ noted that the "VE testified that the requirements of the private sector surveillance monitor jobs are identical to the requirements of the public sector surveillance monitor jobs described in the DOT, with the only difference being the setting (private vs. public)."  AR 31. The ALJ explained that the VE testified that his knowledge of the private sector "is based largely upon his own observation and analysis of the performance of the surveillance system monitor position in the private sector, i.e., at Wal-Mart, a company for which he has conducted job analyses."  AR 32.  In addition, the ALJ noted that he provided an opportunity for Ms. Valencia to present evidence to the contrary.  AR 32.  The ALJ stated:

> After the hearing, counsel submitted what purports to be a job description from Wal-Mart, as well as a written description of a conversation he reportedly had with a Wal-Mart employee, in support of the contention that the private sector surveillance position is beyond the claimant's RFC.  I give this "evidence" no weight because it is unclear whether the report submitted is complete and accurate, or whether it applies only to one Wal-Mart store.  Further counsel is not a proper witness.  While he could have hired a vocational expert to provide evidence material to the issue, he did not.

AR 32.  In accordance with SSR 00-4p, the ALJ found that the VE provided a reasonable explanation to expand the information contained in the DOT.  AR 32.  Thus, "based on the VE's well-supported opinion," the ALJ found that there existed other jobs in significant numbers in the national economy that Ms. Valencia can perform.  AR 32.

The ALJ thus concluded that the Ms. Valencia was not under a disabled, as defined in the Social Security Act, at any time from the alleged date of December 15, 2004 through the date last insured on December 31, 2008.  AR 32.

## ANALYSIS

Ms. Valencia challenges the ALJ's decision on two grounds: 1) the ALJ failed to consider the side effects of morphine on Ms. Valencia's ability to perform the work of a surveillance monitor; and 2) the ALJ erred by finding that there existed a significant number of surveillance monitoring jobs.  Pl.'s Mot., ECF No. 13.  The court remands for consideration of Ms. Valencia's alleged side effects from her medication and to conduct a proper inquiry as to the number of surveillance-monitor jobs in the private sector.

## I.   LEGAL STANDARD

### A.   Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision.  *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

### B.   Applicable Law: Five Steps to Determine Disability

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520.  The five steps are as follows:

> **Step One.**  Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(i).
>
> **Step Two.**  Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments described in the regulations?  If so, the claimant is disabled and is

1   entitled to benefits.  If the claimant's impairment does not meet or equal one of the
2   impairments listed in the regulations, then the case cannot be resolved at step three,
    and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).

3       **Step Four.**  Considering the claimant's RFC, is the claimant able to do any work
    that he or she has done in the past?  If so, then the claimant is not disabled and is not
4   entitled to benefits.  If the claimant cannot do any work he or she did in the past, then
    the case cannot be resolved at step four, and the case proceeds to the fifth and final
5   step.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).

6       **Step Five.**  Considering the claimant's RFC, age, education, and work
    experience, is the claimant able to "make an adjustment to other work?"  If not, then
7   the claimant is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v).
    If the claimant is able to do other work, the Commissioner must establish that there
8   are a significant number of jobs in the national economy that the claimant can do.
    There are two ways for the Commissioner to show other jobs in significant numbers
9   in the national economy: (1) by the testimony of a vocational expert or (2) by
    reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app.
10  2.  If the Commissioner meets this burden, the claimant is not disabled.

11  For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts to

12  the Commissioner.  *See Tackett*, 180 F.3d at 1098

13  ## II.   ALJ FAILED TO CONSIDER SIDE EFFECTS OF MS. VALENCIA'S MEDICATION

14  ### A.  Side Effects of Medication

15  Ms. Valencia contends that the ALJ improperly discredited her testimony regarding the side

16  effects of her medication, specifically the prescribed morphine.  Pl.'s Mot., ECF No. 13 at 7-12.  At

17  the hearing, Ms. Valencia testified that she experienced "dizziness, nausea, blurred vision," inability

18  to concentrate, and possible memory problems that may either be attributed to the medication or the

19  severity of the pain.[5]  AR 70.

20  ─────────────────────

21      [5] It is not clear from the transcript that Ms. Valencia is speaking specifically about the
22  morphine prescription.  After asking Ms. Valencia about whether she has completed a treadmill test,
    her counsel suddenly questioned her about the side effect of her medication.  AR 69-70.  Ms.
23  Valencia's counsel stated, "All right.  Other than the sleepiness that you mentioned as a side effect
    of your medication, are there other side effects?"  AR 70.  Neither Ms. Valencia's counsel or herself
24  specified that she was referring to the morphine when testifying to the side effects.  AR 70.  Ms.
    Valencia referred to the Prozac and the pain medication when she testified that her medications had
25  the side effects of making her sleepy.  AR 66, 52.  Nevertheless, the undersigned will consider the
26  question, because one of her medication, which may include morphine, caused the claimed side
    effects.  AR 70.

27      In addition to her testimony, Ms. Valencia also stated in her "Disability Report Appeal" that
28  she is depressed, "cannot concentrate and handle pressure," and the "p[a]in and the medications
    slow her down and prevent her from doing this and living her life."  AR 183.

To determine whether a claimant's testimony about subjective pain or symptoms is credible, the ALJ must engage in a two-step analysis. *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that reasonably could be expected to produce the alleged pain or other symptoms. *See Lingenfelter*, 504 F.3d at 1036. Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear, and convincing reasons for doing so. *Id*. When the ALJ finds a claimant's testimony not reliable, the ALJ must "specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan*, 169 F.3d at 499. This court defers to the ALJ's credibility determination if it is supported by substantial evidence in the record. *See Thomas*, 278 F.3d at 959.

Here, the ALJ found that Ms. Valencia's impairments could reasonably caused the alleged symptoms, but he found that her statements about the "intensity, persistence, and limiting effect of her symptoms" were not credible to the extent that they were inconsistent with the ALJ's determination of residual functional capacity. AR 28. In so finding, the ALJ did not state that Ms. Valencia was malingering. AR 27-30. The questions remaining then are 1) whether the ALJ was required to consider the side effects of Ms. Valencia's medication, and 2) if so, whether the ALJ rejected Ms. Valencia's testimony regarding the side effects of her medication with specific, clear, and convincing reasons.

The Commissioner contends that the ALJ was not required to consider the side effects of Ms. Valencia's medication because "there was no consistent medical evidence documenting any disabling effects resulting from morphine." Comm'r's Opp'n and Cross-mot., ECF No. 19 at 4 (citing to *Osenbrock v. Apfel*, 240 F.3d 1157, 1164 (9th Cir. 2001). In determining the intensity and persistence of a claimant's symptom, the Code of Federal Regulation provides that the agency will look at several factors such as the "type, dosage, effectiveness, and side effects" of a medication that a claimant has to take in order to alleviate the symptoms. *Berry v. Astrue*, 622 F.3d 1228, 1235 (9th Cir. 2010) (citing to 20 C.F.R. § 404.1529(c)(3)(iv)). In *Berry v. Astrue*, the record revealed that the

UNITED STATES DISTRICT COURT
For the Northern District of California

ALJ acknowledged but discounted as "not fully credible" Berry's complaint "that his pain medications caused some mental confusion and affected his balance." *Id.* Consequently, the Ninth Circuit stated, "[o]n this record, we cannot say that the ALJ failed even to consider the effects of Berry's pain medications on his ability to function." Nevertheless, the Ninth Circuit in *Berry* remanded for further administrative proceedings on some other ground and stated that the "ALJ is free on remand to revisit his RFC determination, including further considering whether the type and dosage of Berry's pain medications render him incapable of meeting the physical and mental demands of his past work . . . ." *Id.*

In challenging Ms. Valencia's contention, the Commissioner cites to *Osenbrock v. Apfel*. Comm'r's Opp'n and Cross-mot., ECF No. 19 at 4. In *Osenbrock*, the Ninth Circuit held that the ALJ did not err by rejecting the claimant's testimony regarding the side effects of his medication, alcohol, and poor conditioning. *Id.* at 1164-65. The Ninth Circuit reasoned that there were passing mentions of side effects in claimant's medication in some medical records but no evidence of side effects severe enough to interfere with claimant's ability to work. *Id.* at 1164. The Court further explained that the claimant testified that the most severe side effects that the medicine caused him was "dozing off" and "dry mouth." In addition, the Ninth Circuit found that the ALJ properly rejected the claimant's testimony regarding the side effects of his medications. *Id.* at 1165-66. In denying the claimant's disability benefits, the ALJ explained that "the claimant has not been using a strong Codeine or Morphine based analgesics that are commonly prescribed for severe and unremitting pain" and "[t]here is no evidence of significant side effects from the medications that he has been taking." *Id.* at 1166. Therefore, the Ninth Circuit in *Osenbrock* held that the ALJ had satisfied its burden in rejecting the claimant's testimony regarding the side effects of his medication. *Id.* at 1165.

Here, Ms. Valencia was prescribed morphine for two to three times a day throughout the period in question, that is the date she filed her disability benefits application in April 2007 to the last insured date in December 2008. AR 675.[6] The record also contains evidence that Ms. Valencia

---

[6] The record indicates that Ms. Valencia was prescribed morphine throughout the period in question. AR 899 (noting morphine prescription on 1/31/2007), AR 1093 (noting continuation of

complained of dizziness and nausea throughout that same period.  AR 683 (dizziness on 9/25/07), AR 1052 (nausea on 4/14/08), AR 1138 (nausea on 10/8/08).  Furthermore, the medical record indicates that Ms. Valencia suffered from sleepiness with her pain medications.  In treating Ms. Valencia in September 2007, Dr. Lina S. Gourova reported the following information: "FIBROMYALGIA Note: Better with last increase in morphine, trying not to take vicodin, doesn't like how it makes her feel.  Somewhat depressed that can not be very active with pain meds - gets sleepy." AR 686.  Therefore, unlike *Osenbrock*, the medical record contains more than passing mentions.[7]

Pursuant to *Berry* and 20 C.F.R. § 404.1529, the ALJ must consider the alleged side effects of Ms. Valencia's medication.  If the ALJ chooses to disregard Ms. Valencia's alleged side effects of nausea and dizziness, the ALJ must provide a specific, clear, and convincing reason that is supported by substantial evidence to discredit it.

The question then is whether the ALJ properly discredited Ms. Valencia's testimony.[8]  In contesting Ms. Valencia's argument, the Commissioner cites to *Thomas v. Barnhart*.  In *Thomas v. Barnhart*, the claimant alleged that the ALJ improperly excluded the side effects of dizziness and difficulties in concentration caused by her pain medication.  278 F.3d 947, 960 (9th Cir. 2002).  The Ninth Circuit held that claimant did not offer any objective evidence that her medications affected

---

morphine on 07/15/07), AR 1090 (noting on 08/26/07 current medication included morphine sulfate 50 mg extended release 2 q8h), AR 1088 (noting that morphine ERR 45 mg t.i.d. was prescribed on 9/11/07), AR 1037 (noting prescription on 1/16/08 for 15 mg, 3 tablets, 3 times a day), AR 1039 (noting prescription on 2/9/09), AR 1051 (noting prescription refill on 3/20/08), AR 1063 (noting prescription refill on 6/9/2008).

[7] In support of her argument that her prescribed morphine causes dizziness and nausea, which in turns decreases concentration and attention, Ms. Valencia also submitted material from Medline Plus. The material submitted states that morphine causes the following side effects: dizziness, nausea, lightheadedness, drowsiness, headache, agitation, nervousness, mood changes, confusion, blurred vision, and others. Ex. 2, ECF No. 13-2, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682133.html.

[8] *But cf.*, *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985) ("A claimant bears the burden of proving that an impairment is disabling.  Miller [the claimant] produced no clinical evidence showing that narcotics use impaired his ability to work") (citing to *Swanson v. Sec'y of Health & Human Services*, 763 F.2d 1061, 1064 (9th Cir. 1985)).

UNITED STATES DISTRICT COURT
For the Northern District of California

1    her concentration or caused dizziness. *Id.* Furthermore, the Court reasoned that she offered only

2    evidence of her own statements to her doctor and her testimony at the hearing. *Id.* In holding that

3    the ALJ properly rejected the claimant's testimony, the Ninth Circuit reasoned that the claimant's

4    testimony "cannot be rejected solely because the objective medical evidence does not support the

5    severity of her impairment" but "the ALJ properly rejected her testimony by using 'ordinary

6    techniques of credibility evaluation' and providing a specific, clear and convincing reason,

7    supported by the record, that her testimony was generally not credible." *Id.* (citing *Bunnell v.*

8    *Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991); *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 791 (9th Cir.

9    1997)). The ALJ found that the claimant's demeanor at the hearing indicated that she engaged in

10   "considerable histrionic exaggeration" and therefore was generally not credible. *Id.* Consequently,

11   the Ninth Circuit held that the ALJ properly rejected the claimant's testimony. *Id.*

12       Unlike the ALJ in *Thomas*, the ALJ here did not find that Ms. Valencia's testimony was

13   generally not credible. Furthermore, the ALJ never discussed Ms. Valencia's alleged side effects of

14   her medication in his opinion. *Lester*, 81 F.3d at 834 ("General findings are insufficient; rather, the

15   ALJ must identify what testimony is not credible and what evidence undermines the claimant's

16   complaints."). Therefore, the present matter is also different from *Berry*, because the ALJ

17   specifically discredited the claimant's side effects in *Berry* and only permitted the ALJ on remand to

18   consider the side effects in revisiting the RFC because the court reversed on a different ground.

19   Here, the ALJ did not even consider Ms. Valencia's side effects.

20       The ALJ may have rejected Ms. Valencia's testimony as to the side effects of the medication

21   because Ms. Valencia failed to continue to seek treatment from the pain clinic.[9] To the extent that

22

23       [9] In determining whether a claimant's testimony regarding the severity of her symptoms is
     credible, an ALJ may consider "unexplained, or inadequately explained, failure to seek treatment or
24   follow a prescribed course of treatment." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991)
     (citing to *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *Smolen v. Chater*, 80 F.3d 1273, 1284
25   (9th Cir. 1996) (citations omitted).

26   In the denial notice, the ALJ reasoned that even though Ms. Valencia's failure to follow the
     treatments that her physicians recommended is not conclusive as to her credibility or RFC, the ALJ
27   noted that it does suggest "in light of the other evidence that her symptoms are not as serious as
     alleged." AR 29-30. The ALJ also noted that Ms. Valencia did not follow up with a psychiatrist
28   even though Dr. Hoffman recommended that she do so and that she did not go to receive treatment
     for pain at a nearby pain clinic even though her primary physician recommended her to do so. AR
     29.[7] At the hearing, Ms. Valencia testified that she did not go to the pain clinic nearby, because she

UNITED STATES DISTRICT COURT
For the Northern District of California

1    this may be true, this determination must be made by the ALJ, not the court.  *See SEC v. Chenery*,

2    332 U.S. 194, 196 (1995).  The court cannot provide post-hoc rationalizations to affirm the ALJ's

3    decision.  *Id*.

4        In asserting harmless error, the Commissioner contends that Ms. Valencia failed to satisfy her

5    burden to show harm because she does not cite to any medical record in which she reported

6    debilitating side effects to her physicians.  As demonstrated below in subsection B and C, the

7    undersigned cannot say in the context of the record as a whole that the ALJ's disregard of the DOT

8    is harmless or "inconsequential to the ultimate nondisability determination."  *See Molina*, 674 F.3d at

9    1122.  Therefore, the undersigned finds that ALJ did not properly consider the side effects of Ms.

10   Valencia's medication and failed to provide a specific, cogent, and clear reason for doing so.  This

11   failure was not a harmless error.

12       To illustrate how the analysis of the RFC and the hypothetical might change on remand, the

13   court summarizes the evidence in the record about the RFC and the hypothetical.

14   **B.  RFC**

15       For the RFC, the only limitation at issue is Ms. Valencia's ability to maintain concentration and

16   attention.  Ms. Valencia contends that the ALJ erred by finding that she had a slight limitation in

17   concentration, persistence, or pace because her prescribed morphine causes decreased concentration

18   and attention greater than the ALJ's RFC finding.  Pl.'s Mot., ECF No. 13 at 5-10.

19       Preparing a psychiatric review technique report, Dr. Lucila found that Ms. Valencia had a mild

20   limitation in maintaining concentration, persistence, or pace.  AR 451, 459.  Dr. El-Sokkary reported

21   that Ms. Valencia was alert and oriented, and she "was able to maintain a sufficient level of

22   concentration, persistence, and pace to do moderately complex work in an environment that health

23   condition would allow."  AR 305-06.

24       Citing to Ms. Valencia's records from the HELP pain management program, Dr. El-Sokkary's

25   report, and Ms. Valencia's testimony at the hearing, Dr. Agler testified that Ms. Valencia had only

26   mild limitations in concentration, persistence, and pace.  AR 73-74.  Dr. Agler explained that at the

27   hearing, Ms. Valencia was able to pay attention to the issues, follow them, and provide appropriate

28   responses.  AR 75.  Furthermore, Dr. Agler explained that Ms. Valencia did not appear to have a

did not have transportation.  Her husband had to work and there were no nearby buses.

severe problem when Dr. El-Sokkary carefully measured her concentration but "if you take the psychological at face value then yes, she might have some problem." AR 75.

The ALJ's RFC finding conflicts with the ALJ's own finding at step 3 that Ms. Valencia has a mild to moderate limitation in concentration, pace, or persistence.  AR 26-27.  A RFC is the most a claimant can do despite his or her limitations, *see* 20 C.F.R. § 404.1545(a)(1), although the analysis at step 3 differs from the analysis at steps 4 or 5, which require a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments.  AR 27 (citation omitted).

The Commissioner contends that even though the ALJ may not have explicitly addressed Ms. Valencia's side effects from her medication there was sufficient evidence, including Dr. Agler's testimony and Ms. Valencia's activities, to support the ALJ's RFC finding of a mild limitation on concentration, persistence, and pace.  Comm'r's Opp'n and Cross-mot., ECF No. 19 at 7 (citation omitted).  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication.") (citations omitted)).

On remand, the ALJ should consider the side effects of Ms. Valencia's medication and how it affects the RFC.

**C. Hypothetical**

At step five, if (considering RFC, age, education, and work experience) the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.  20 C.F.R. § 404.1520(a)(4)(v).  The Commissioner may sustain its burden at step five by posing hypothetical questions to a vocational expert that are based on a claimant's RFC.  The vocational expert may give evidence about jobs that a hypothetical employee with the same RFC as the claimant would be able to perform.  *See* 20 C.F.R. § 404.1520(g).  A vocational expert's recognized expertise provides the necessary foundation for his or her testimony, and no additional foundation is required.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217-18 (9th Cir. 2005).  The hypothetical questions must be based on a RFC for which there exists substantial support in the record.  *See Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989).

Ms. Valencia contends that the ALJ failed to consider the effects of prescribed morphine on her ability to perform the identified alternative work as a surveillance-system monitor (DOT# 379.367-010). Pl.'s Mot., ECF No. 13 at 7-12. The ALJ accepted the vocational expert's testimony that Ms. Valencia could perform the work of a surveillance monitor. AR 31. According to the Dictionary of Occupation Titles, a surveillance-system monitor is described as an individual that does the following:

> Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

Ex. 2, ECF No. 13-1 at 1.

The Commissioner also cites to *Greger v. Barnhart* in responding to Ms. Valencia's argument that the ALJ should have incorporated the medications' side effect. Comm'r's Opp'n and Cross-mot., ECF No. 19 at 6. In *Greger v. Barnhart*, the Ninth Circuit held that the ALJ was not required to incorporate the claimant's side effect of fatigue from taking his medication into the hypothetical question to the VE because the claimant did not report any fatigue to his doctors during the relevant time period. 464 F.3d 968, 973 (9th Cir. 2006). Therefore, "the ALJ properly limited the hypothetical to the medical assumptions supported by substantial evidence in the record." *Id*.

Unlike the claimant in *Greger*, Ms. Valencia, as mentioned above, reported nausea and dizziness to her physicians on several occasions. Remand is appropriate for the ALJ to revisit Ms. Valencia's ability to perform the job of a surveillance-system monitor in light of her alleged side effects from her medication.

### III.    INSIGNIFICANT NUMBER OF SURVEILLANCE-SYSTEM MONITOR JOBS

The last issue is whether the ALJ erred by finding that a significant number of surveillance-system monitor jobs exist. Ms. Valencia contends that 1) 114 regional jobs and 14,082 national jobs are not significant numbers and 2) the ALJ improperly accepted the VE's testimony that the number of surveillance-system monitor positions are greatly underreported. Pl.'s Mot., ECF

No. 13 at 12-19.  Remand is appropriate to conduct a proper inquiry as to the number of jobs that exist in the private sector as opposed to the public sector.

If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.  Under 42 U.S.C. § 423(d)(2)(A), an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  "Work which exists in the national economy" is defined as work that exists in significant numbers either in the region where the individual lives or in several regions of the country.  20 C.F.R. § 416.966.

The Ninth Circuit has never established a bright-line rule to determine what constitutes a "significant" number of jobs; nonetheless, the Ninth Circuit has stated that "comparison to other cases is instructive."  *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).  In *Beltran v. Astrue*, the Ninth Circuit found that 135 regional jobs and 1,680 national jobs as a surveillance-system monitor is not a significant number of jobs.  Here, 114 regional jobs in the Greater San Francisco Bay Area is fewer than the 135 regional jobs in *Beltran* and therefore, is not a significant number.  AR 31; *see also Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) (holding that between 1,000 and 1,500 jobs in the local area was a significant number); *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1986) (holding that 3,750 to 4,250 jobs in the Greater Metropolitan Los Angeles, Orange County area constituted a significant number).  As the Commissioner contends, the number of national jobs here exceeds the 1,680 national jobs that the Ninth Circuit found was insignificant in *Beltran*. Nevertheless, when compared with other cases in the Ninth Circuit that finds the number of national jobs as significant, the court finds that "14,082 such positions reported in the United States (national economy)" is not a significant number.  AR 31.  In *Moncada v. Chater*, the Ninth Circuit found that 2,300 jobs in San Diego County and 64,000 jobs nationwide are significant numbers.  60 F.3d 521, 524 (9th Cir. 1995); *see also Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002) (finding 1,300 jobs in Oregon region and 622,000 in the national economy as significant); *Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000) (finding 7,700 regional and 125,000 national jobs as significant);

UNITED STATES DISTRICT COURT
For the Northern District of California

1   *Coletta v. Massanari*, 163 F. Supp. 2d 1101, 1106 (N.D. Cal. 2001) (finding 363 jobs in the state

2   economy and 4,752 positions in the national economy as insignificant).  Therefore, 114 regional or

3   14,082 national positions do not constitute a significant number as defined in 42 U.S.C. §

4   423(d)(2)(A).

5       Ms. Valencia contends that the ALJ erred by accepting the VE's testimony that the numbers of

6   surveillance-system monitor positions are greatly underreported as an indication that a significant

7   number of jobs that exist in the national economy which Ms. Valencia could perform.  Pl.'s Mot.,

8   ECF No. 13 at 12-19.  The Commissioner did not present any arguments in response to Ms.

9   Valencia's argument and only contested whether 114 jobs regionally and 14,082 jobs nationally

10   constituted a significant number of jobs.  Comm'r's Opp'n and Cross-mot., ECF No. 19.

11       An ALJ must rely primarily upon the DOT for guidance as to the employee requirements for

12   different job types in the national economy.  *See Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir.

13   2007).  The DOT creates a rebuttal presumption as to the job classification.  *See Tommasetti v.*

14   *Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008).  Although the ALJ may also consult testimony from

15   vocational experts, the ALJ must ask the vocational expert "'if the evidence he or she has provided'

16   is consistent with the Dictionary of Occupational Titles and obtain a reasonable explanation for any

17   apparent conflict." *See Massachi*, 486 F.3d at 1153 (quoting Social Security Ruling 00-4p at *4).

18   After finding a discrepancy, "the ALJ must then determine whether the vocational expert's

19   explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather

20   than the Dictionary of Occupational Titles."  *Id*.

21       The problem is, as Ms. Valencia contends, that the VE did not produce a number or an estimate

22   of the actual number of surveillance-system monitor jobs in the private sector.  Pl.'s Mot., ECF No.

23   13 at 18.  The ALJ accepted the VE's opinion that the surveillance-system monitor jobs are "greatly

24   underreported" and concluded that the surveillance-system monitor "jobs exist in significant number

25   in the public and private sectors of the regional and national economies."  AR  32.  The court cannot

26   say that there is substantial evidence to support the ALJ's finding that a significant number of

27   surveillance-system monitor jobs exist.

28       The question then is whether the error is harmless.  The Ninth Circuit held in *McLeod v. Astrue*

that the harmless error rule also applies in the social security context.  640 F.3d 881, 887 (9th Cir.

1    2011) (noting that the Supreme Court established that administrative adjudicators are subject to the

2    same harmless error rule as ordinarily applied in civil cases (citing *Shinseki v. Sanders*, 556 U.S. 406

3    (2009))).  An error is harmless when it is clear that the excluded evidence was "inconsequential to

4    the ultimate nondisability determination" in the context of the record as a whole.  *Molina v. Astrue*,

5    674 F.3d 1104, 1122 (9th Cir. 2012) (citations omitted).  The plaintiff, as the party attacking the

6    agency's decision, normally bears the burden of proving that an error is harmful.  *Id.* at 1111 (9th Cir.

7    2012) (quotation omitted).

8        The court cannot say in the context of the record as a whole that the ALJ's finding is harmless or

9    "inconsequential to the ultimate nondisability determination."  *See Molina*, 674 F.3d at 1122.

10   Depending on the number of jobs that existed at the time of hearing for private surveillance monitor

11   system, the finding at step five may change and therefore may change the ultimate decision.  As

12   such, remand is appropriate in this context.

13   **IV.    REMAND FOR CONSIDERATION (As Opposed to Awarding Benefits)**

14       It is within the court's discretion to remand a case either for further administrative proceedings

15   or for an award of benefits.  *See McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  Here, the

16   record is not developed fully, and the court thus remands to the ALJ.

17                                   **CONCLUSION**

18       The court **GRANTS** Ms. Valencia's motion for summary judgment, **DENIES** the

19   Commissioner's cross-motion for summary judgment, and **REMANDS** this case to the

20   Administrative Law Judge to consider Ms. Valencia's alleged side effects and how it affects the

21   RFC and hypothetical and to conduct an appropriate inquiry as to the number of

22   surveillance-monitor jobs in the private sector.

23       This disposes of ECF Nos. 13 and 19.

24       **IT IS SO ORDERED.**

25   Dated: March 25, 2013

26                                   _____
                                    LAUREL BEELER
27                                   United States Magistrate Judge

28

*UNITED STATES DISTRICT COURT*
*For the Northern District of California*